So the first case is number 23-1356, Regents of the University of California v. Satco Products. Mr. Hanson. Good morning, Your Honors. May it please the Court. The board's decision should be reversed without remand because it adopted new rationales that departed from round three in the petition and is based on numerous procedural, legal, and factual errors. I'll begin with the Foster Limitation. The party's substantive disputes on this limitation concern whether Yanazaki discloses the claims to FOSFOR. There are also procedural disputes as to the board's alliance of Satco's reply evidence and arguments, and the board's sui spate construction of FOSFOR after the hearing. Okay, but two questions about that. You're correct, I think, based on the record, that the board did adopt a new claim construction in the final written decision. You did have the opportunity to address that at the oral hearing, so I guess I have three questions. One is why isn't that a sufficient opportunity at the oral hearing? Two, under exonics, we said that you have to give the parties an opportunity to respond to a new claim construction, but in footnote seven, we said if it's sufficiently similar to a dispute that the parties already had, there's no violation. And then third, my question is whether it is a harmless error, given that you haven't indicated what you would have done differently if the board had given you an opportunity to respond to the new claim construction. So could you try those three issues? I will do my best, Your Honor. First, reviewing the transcript of the hearing, what was discussed was not framed as a claim construction dispute, and what was litigated throughout the course of the IPR was a dispute about the disclosure of the Yamazaki prior art reference. It wasn't about the proper construction of the patent claim language. A factual dispute about the scope and content of a prior art reference is a very different analysis of the legal question of the proper construction of the claim term as it's used in the patent. We would have argued very differently had we been presented with the question of what is the meaning of the term phosphor in the patent. How would you have argued it differently? We would have engaged in the traditional claim construction analysis as opposed to a factual analysis of the prior art. That doesn't tell me what you would have argued. But your server reply did argue claim construction in effect. I'm looking at it right here, and you're talking about the scope of the claim term, phosphor. That's not the issue that was presented by the petition and the petitioner is our argument. Well, the first words out of your mouth was that you were going to start by talking about the issue of whether phosphor was disclosed by Yamazaki, right? Yes. So the question is, you have phosphor in the claim limitation, and then you have the Yamazaki disclosure, which says something, and the question is, is that fit within phosphor or not? Which, if you're questioning whether phosphor is broad enough to encompass what's in Yamazaki, that's claim construction, and when you look at your server reply, that's exactly what you're addressing, right? I suppose that's a fair point, Your Honor. My point, as I've said, is this was not raised by the petitioner as a claim construction issue. But you had noticed an opportunity to be heard, right? We did, but it's only appropriate for the board to depart from the party's proposed claim constructions, where there is a dispute. In this case, the petitioner took the position that there was no construction required. The regents agreed with that, and the board's institutional decision also agreed that no construction was required. But what – coming back to – I mean, you can't prevail unless there's harmful error. Since the parties argued about the meaning of fluorescent material, whatever the language was, and phosphorus, what would you have done, presented to the board that you didn't present? Well, I'm not sure exactly what we would have argued differently. Oh, that's a problem. We're not in that position. We were in a position of arguing about the factual question of what was disclosed by Yamazaki. Okay, but it's your obligation to show harmful error. And if you can't show us what you would have done differently, then it would seem as though it's harmless. Maybe I can answer it this way. What the board relied on as evidence that the terms phosphor and fluorescent material were interchangeable was the Shimizu prior art reference. And the Shimizu prior art reference, in its claims, it uses the two terms separately. In its claims, it recites separately a phosphor and then a fluorescent material that could be a phosphor. It sounds like you're complaining about the board's interpretation of the prior art reference that it relied on to understand the plain meaning of the term, right? Yes. But what is the standard of review that we would apply to that? A de novo review of the legal determination and a substantial evidence review of the factual findings. So that would be a substantial evidence review, right? Because looking at extrinsic evidence and, you know, the prior art, looking at the prior art or a dictionary or any other extrinsic evidence to try to understand the meaning of a term, that's a fact finding, so it's reviewed for substantial evidence, right? Yes. So you're just really more complaining about the weight that the board gave to this. I'm complaining about the fact that the Shimizu reference, if you read it fairly and consistently, with this Court's well-established canons of claim construction, actually should have resulted in the conclusion that the terms phosphor and fluorescent had distinct meanings because they're separately recited in Shimizu's claims. You argued that for the board, right? I believe we did. Yeah. But when a term is used interchangeably in a reference, that means you're using both terms. But sometimes the way you read that is that they're distinct, and sometimes you read it as though they're being used interchangeably. Isn't that the fact finder's job to decide which it is? Yes, I believe so. All right. Why don't you go on? I'll move on to another claim limitation. I'll now discuss the cathode anode limitation. The plaintiff's speech regarding the cathode anode limitation focused on whether Yamazaki's disclosure of Conductive Patterns 11A in Figure 1 meet the structural support requirement recited in the claim language. This petition states that there were two conventional ways known at the time to produce conductive patterns as shown in Yamazaki. Stamping sheet metal to form J-shaped leads to wrap around the plate or depositing slash etching a metal film. Satco and its expert contended that the former method was suggested by the thickness of element 11A and the shape of it shown in Figure 1, while the regents argued that the latter method was indicated by Yamazaki's use of the term pattern along with the difficulty and inefficiency of manufacturing J-leads at this scale. The board's finding that Yamazaki allegedly discloses the cathode anode limitation rests entirely on the boldness of Conductive Patterns 11A as illustrated in Figure 1. Well, I don't think that's true. I think they relied on the J-shape. That's correct. I just noted that as well. And in addition, the context of the knowledge of the skill in the art that the expert was relying on when the expert looked at that figure and said, I think that satisfies the claim limitation because it's consistent with what I know about J-leads based on these other things that are out there in the prior arts. Sort of bringing it together, that's what the figure conveys to me as a skilled artist. So the expert played a role too, right? He did, but I would point out this very important admission from the expert. First, to the extent that Figure 1 can be properly relied on as showing the particular dimensions of the elements, which we dispute because it's not drawn to scale, the board acknowledged at Appendix Page 43 that the thickness of the Patterns 11A are similar to the thickness of the transparent Adhesive Agent 11B, which Yamazaki teaches is spread thinly and a person of ordinary skill would understand is on the order of 1 to 10 microns thick. Is that your expert's testimony? That's the board. Oh, that was the board. That was the board. And then Sacco's expert admitted in deposition that matter must be more than a few microns thick to be formed into a J-lead. That's at Appendix Page 7656, Transcript Page 74, Lines 16 to 17. So, in other words, Sacco's expert admitted that a layer of the thickness the board found Conductive Patterns 11A to have could not be made into a J-lead as he had proposed. And the board gave no explanation for ignoring that contrary admission by Sacco's expert in the course of finding that Conductive Pattern 11A discloses a J-lead. Is the board obligated to explain or address every contrary admission? The board is obligated to address all of the evidence and arguments made by the parties. Really? All of it? Let's see, I can direct you to a case that I... So the Applications and Internet Time case states that substantial evidence review requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from the agency's opinion. And under the winner case, when considering a proposed modification of one reference's disclosure with the teachings of another, the benefits both lost and gained should be weighed against one another. Where exactly in the board's opinion do you think it erred with respect to interpreting the figures to determine dimensions? Well, the board acknowledged that Yamazaki lacks detail about the structure and manufacture of Elements 11A. That's at Appendix Page 44. And it also acknowledged at Appendix Page 45 that Yamazaki's figures do not define the precise proportions of the elements. So in light of that acknowledgement, Figure 1 cannot be substantial evidence to show the particular size of the Conductive Patterns 11A under the well-established case law and MPEP section collected in the Hawkers and Helders case that we cited. I see your argument. I think there is a page where, you know, of course they admit that it's not drawn to scale. But they also say, you know, in talking about whether these JLEADs provide structural support, which is what the limitation, the claim limitation, I think, requires.  They looked at how it wrapped around, as shown in the figure. And then they did talk about the boldness or something showing that it's relatively thick. Are you challenging that finding about relatively thick? I would say that we are. Because the figure is not drawn to scale, and the relative thickness, the board found that the relative thickness was similar to the thickness of the Adhesive 11B, which the board found a person of skill in the art would understand to be 1 to 10 microns thick. And then Sackler's expert testified that metal has to be more than a few microns thick to be bent into a JLEAD. But DuPont also said that when you looked at the figure, when he looked at the figure, it reflected not only that sense of thickness, but he didn't go right from thickness to structural support. He said, that tells me that it is this type of connector. It's this JLEAD, this type of support, and then expanded from there. So he didn't just say, oh, I see the thickness. Therefore, it satisfies the claim limitation. Right? That's correct. But then in his deposition, when he was cross-examined about this, he admitted that a JLEAD can't be formed from metal that's just a few microns thick. Well, I have a question for you first. You keep on saying that the board talked about, you know, the relative thickness with transparent adhesive agent 11B. Where is that? Because I only see the patent owner, the board's repeating the patent owner's argument. It doesn't mean the board's adopting it. That was on appendix page 43. Yeah, that's saying the patent owner's argument. It says patent owner points out. Right? That's not the board. It seems a bit weird with our... No, I don't think so. So lots of times in these cases, what the board does is it'll say, Pitcher Schnur argues this. Patent owner argues that. This is what we conclude. And you shouldn't be pointing to a section that's on what patent owner argues and saying it's what the board held unless the board expressly does so. I do think that the board talks about relative thickness at the top of page 845. Absolutely. It does. So I just wanted to make sure it was clear, you know, that this discussion at 843 is what the patent owner's talking about, not what the board is holding. Understood. Okay. So help me understand what you're talking about. You're saying that the board found that the lead was only a few microns thick. I mean, explain that to me. We'll argue that to the extent that, even though the figure's not drawn to scale so the dimensions can't really be discerned, to the extent that we are going to take something about the dimensions from the figure itself, the figure illustrates conductive elements 11A to be of a similar thickness to the adhesive 11B. And the written description expressly describes 11B as being, I believe, 1 to 10 microns thick. I see. Okay. I get that. All right. I'm going to save the rest of your time. I did want to resume some time. I'm done with a minute left. We'll give you two minutes.  Mr. Brown. Good morning, Your Honor. I'll be brief. On the phosphor point, there was a question about whether there would be any difference in this analysis if it was done as a claim construction issue or the way it was actually argued below. And the answer is no, there would be no difference. And we know that there would be no difference because the parties agreed that the term should have its ordinary meaning. And what the board did was set out to decide what that ordinary meaning was. The only way that the term would have a different meaning in the context of claim construction is if the patent gave it some special meaning, but we know that it doesn't. So there really is no difference in this case in terms of whether you call this analysis a claim construction question or an analysis about what the term means to a person of ordinary skill. But you agree that the board sort of sprung this as a claim construction on the parties in the final written decision. Absolutely, Your Honor. Throughout the case, what was litigated was whether Yamazaki discloses a phosphor. But not as a claim construction issue. Correct. You say it doesn't make any difference because the arguments are the same. That's what I'm saying, Your Honor. So that was the first point. I think there's a clear answer to the question that he would not have made a difference substantively if it had been addressed in a different legal context. Because the facts show the terms are interchangeable. And that there's no special meaning applied to the term phosphor in the patent. Okay, so that was my first point. And then briefly on the cathode anode point, I believe that the questions from the panel sum up my arguments very well, which is the board explicitly relied on both the shape and the relative thickness in figures. Both of those things are qualitative aspects of the figure that can be relied upon in a figure that is not to scale under the authority cited in the briefs. They relied on the expert's understanding, as was pointed out by Judge Murphy. So the idea is that 11B is a few microns thick, which wouldn't be sufficient for a J lead. So it's necessary to conclude that 11A, if my memory is correct, is thicker than 11B. That is correct. I believe that the testimony shows that our expert understood that it was much thicker. A J lead is much thicker than a few microns. So what's illustrated— And he relied on the figure. But not for the point that it's much thicker. He relied on the figure for the idea that it shows a J lead. How did he arrive at the conclusion that it was much thicker? Oh, he did it. That was never advanced as an argument. That's me responding to the argument I heard from counsel. So as I understand— So your point is that the patent owner is the one who started looking at the figures and trying to determine relative sizes based on the figures. Yes, Your Honor. That's what I'm trying to say. And so then—but the only concern I have is that there is a part that Judge Dyke pointed out. I think it's on page 25, page 25 of the record, where the board says—  Oh, 45. Where it talks about that it provides structural support because the line is thick in the figure. Yes. How do you respond to that? Because we have cases like NRA Newvasive and I think it's Hagerstadt, which say you're not allowed to look at figures to determine relative proportions. So the facts of NRA Newvasive, which I think are very significant here, are that there was a figure that showed that there were three of something, as I recall. Maybe it was two of something that fit into a space. And the specification showed that the space had a distance, had a width of some number. And so what this court held in that case was because there's three of them that fit into the space, that shows that all three of those things are smaller than the space. And they did a space divided by three calculation. So they were using the qualitative, not quantitative, qualitative characteristics of the figure to arrive at a conclusion that turned out to be a numeric conclusion in the Newvasive case because it was based on a number, a measurement in the specification. And so my argument would be the same thing as what should happen here. It doesn't have to be a number, but you can look at the qualitative qualities of the figure. You can look at relative size, but you can't expect it to be precise. Is that your argument? It's two different places. So why are figures not to scale? One, because they're trying to illustrate things. Some things are too tiny to see, so they need to make them thicker. Yes, exactly. That's my point. And so this epoxy layer that is adhering there, they need to point the arrow at it somewhere. And so they point it to this very, very thin place. The things around the outside are also heavier lines. And in the figure, it's true that they're about the same size, but that's because they both need to be illustrated in the figure. How can we say, oh, well, we know that the epoxy is made bigger just so that people can see it, but the J-leads were supposed to understand from the boldness that that conveys a particular thickness when it's very clear that other parts of the figure, it's really not drawn to size? We never argued it was drawn to size. We agree it's not drawn to size. That's never been the argument. The argument is you can tell from the shape and the fact that they are emphasized, whether you call that relative thickness or boldness as the board, but primarily you can tell it from the shape. And if you look at the figure— Is that what your expert said? Yes, that you can tell it from the shape, that when he looks at the figure— Okay, but shape is just one aspect of it. It has to be a J-shape, but it also—to be a J-lead, it also has to have a certain thickness, right? I don't— No? This thickness issue, I think, is just a red hair. The problem is that even if you didn't advocate for it, I'm concerned about the board because they say, we agree that figure one emphasizes the thickness of element 11A in relation to chip 11, and thus a person of ordinary skill in the art would have understood Yamazaki to teach the use of relatively thick J-lead, metal leads that provided structural support. That sentence concerns me because it's all about the figures and thickness. If they would have said something like, and in any event, setting that aside, we think there's structural support because it wraps around, I could feel comfortable. But here, I'm concerned there's an error. So I just want to know, what is your response to that? My response is that's not the only part of the board's decision, and I can get it up and look at it, but they go on to explain that the shape is consistent with what's shown in the prior art. But shape alone isn't enough, is it? I thought there was agreement that to service a J-lead, it had to have this J shape, but it also had to have a thickness in excess of a few microns or whatever. Our expert conceded that. So when you stamp something out of metal and bend it, we're talking substantially more than microns. Is that what he said? He said that because it was shaped that way, it had to be more than a few microns thick? I don't recall. How did he address the thickness issue? He did not address the thickness. This was in his deposition after we put in his testimony. There was no, frankly, Your Honor, I didn't appreciate, even during the deposition, the argument that was going to be made that this then could be compared to the epoxy and therefore. So there was no response. This is purely an argument by counsel based on a question in a deposition. But I want to come back to the board's decision, and if I can get it up. It's top of 45. Yeah, I have it. Thank you, Your Honor. Yeah, they also say that Yamazaki emphasizes elements 11A and bold, indicating the element's thickness relative to other proportions. But I'm not aware of any convention that says that when something's in bold, that means it's thick. So the part that I think is more important, Your Honor, is earlier in the discussion, starting at 31, but really going on to 42. And at 31, actually even before 41, I'm sorry. Hang on. No. Okay, it's 42. So they're discussing both sides' positions on Yamazaki and 41. And then on 42, they say, we do not agree with patent owner's characterization of Yamazaki's disclosure. First, we find Yamazaki's Figure 1 plainly shows electrically conductive patterns 11A at opposite edges of chip substrate 11, with each conductive pattern wrapping around an edge of the substrate. So that's the first finding. That's the shape finding. Then they say, in fact, the lines depicting 11A are bolded. They say that the only bolded feature shown in any of the figures in such a way as to appear to emphasize the wraparound nature of the pattern. Now, the word bold is new, but the point that these lines are thicker to show the wraparound nature of the pattern was precisely the argument that we advanced and that our experts supported. And they cite the expert declaration here, as well as Yamazaki. What is Exhibit 2034? Is that expert declaration? I'm sorry. Say your number again. This is on top of page 45 of the Board's decision, and there's a citation by the Board to Exhibit 2034, paragraph 246. What's that a cite to? I believe that that is just from the number. I don't know, Your Honor, but I believe that that's a cite to a rebuttal exhibit just from the number, but I don't know what that's a cite to. The part that I was talking about was on page 42. I hear what you're saying. I agree. I think there's substantial evidence of support that it's JLEAD that wraps around. The concern, at least that's my view, the concern I have is about, you know, the claim limitation requires structural support, and I don't see a sentence where the Board is linking the JLEAD wraparound to structural support so much as it's linking this thickness finding to structural support. And the way I would put you there is the sentence that spans 44 to 45. It doesn't say it expressly, but what it says is that there's evidence that the leads similar to shown in Figure 1 bent around the package body were used in the 1990s. I've misquoted it slightly, but that's going from 44 to 45, and there's a series of citations there, and one of the citations there is the textbook that we, with the figure that shows the leads wrapped around the body, and the others I believe are Hahn and Umira, which are other packaging references that we cited. So may I ask, in the Board decision where we've been talking about, the Board cites to Paragraph 246 of DuPois' declaration, which is when he's analyzing this portion of the figure in Yamazaki, and it seems to me what DuPois is talking about is he says when you look at this figure, you have to start with the understanding and the skill and the art. This is what he says, right? He says you have to start with the understanding there's two ways to make these leads because the patent, Yamazaki itself says it's electrical conductive material or something like that. He says, well, there's two ways you could do it, either with a depositor-rich film or with the J-leads. And when I look at the figure, it's consistent with J-leads, and that would make sense because that's an easier way to do it, and also I see they wrap around, and also I don't see any signs in the figure that would be consistent with the film, right? So isn't that where, and the Board cites that, do you think that's where the Board's getting this? Yes, I think that's absolutely part of where the Board is getting this. That was the argument we made below your honor. Who was your expert below? It was DuPois. Okay, so this tape is to the Schubert Declaration, the Exhibit 2034, Paragraph 246 that Judge Dyke asked about. Is that the patent owner's expert? No, that's DuPois. That was our expert then. That was your expert? Yes. Okay. Thank you, Your Honor. And that's the testimony where he says, looking at this, I would conclude that this was a J-lead. Yes. Yeah. Okay. Why don't you move on to whatever else? That was what I had, unless there's further questions from the panel. Okay. Hearing none, thank you. Mr. Hanson, you have ten minutes. So to address this point that we were just discussing, it is, in fact, Paragraph 246 of their expert's declaration. That's on Appendix Page 6664. It explicitly relies on the thickness of Element 11A, as it's illustrated in the figure, as support for his conclusion that it was a J-lead instead of a thin metalization. There was no dispute that a thin metalization could not provide the structural support that the claim requires. We're not contesting the shape, the J-shape of the lead. We're saying it is a metalization that's too thin to provide structural support. And I believe, as I pointed out earlier, their expert admitted in deposition that you couldn't form a J-lead of a metal layer that thin. But the only way you know it's thin is from the other dimension on the figure. So doesn't your own case law work against you? Yes. Our view is that, under the case law, you can't take anything from the figure about what the dimensions of those layers are. But if you are going to do that, the only place that Yamazaki... Don't you need to do that to undermine Du Bois' testimony? His testimony is based on the thickness, so he's relying on the dimensions. In part. But there are some other things that I just mentioned, too. Right. But... Do you agree with him that there's really only two ways to do it, and so he basically just had to decide which was more likely? Yeah. That's the state of the evidence. I'm not an expert, so I can't opine on that. But that's what the experts, I believe, agreed on. Before my time runs out, with regard to the question you raised about harmless error, in the Qualcomm case in footnote 3, the court indicated it was an open question whether you had to show prejudice to show an APA violation. But the prejudice to us, and we pointed out in our opening brief on page 29, that had SATCO, in its reply, raised the new claim construction issue as a way to get around the mistake it made in submitting the wrong translation of Yamazaki, that would have been in violation of the board's rules, and we could have objected to it on that basis at that time. We didn't have that opportunity because SATCO never presented it that way. But as soon as they erroneously treat it as a matter of claim construction, you haven't shown what you would have said if you'd known about that earlier. They would have had a different record developed about what's... That's just an abstract statement. You haven't said what it is you would have put in the different record. There's nothing in the brief about what you would have done otherwise. First, we would have objected that it's in violation of the board's rules for them to bring it up. That doesn't satisfy the harmless error standard. You say you would have objected. You have to show that it would have reached a different result potential. Anyway, there it is. Am I out of time, I believe? I think you are out of time. Thank you. Thank you. Thanks to both counsel and cases.